UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| MICHAEL MAHON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 10-11611-WGY |
| UNITED STATES OF AMERICA, | ) | |
| EASTERN NATIONAL, and | ) | |
| AMELIA OCCASIONS, INC. doing | ) | |
| business as HISTORIC VENUES | ) | |
| doing business as THE | ) | |
| COMMANDANT'S HOUSE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER

YOUNG, D.J.                                           July 7, 2011

I.    INTRODUCTION

The plaintiff, Michael Mahon ("Mahon"), brings this suit

against the United States of America, Eastern National, and

Amelia Occasions, Inc.  Mahon alleges that unsafe guardrails at

the Commandant's House of the Charlestown Navy Yard caused him to

fall from a portico and suffer severe injuries.  The United

States moved to dismiss the claim against it, arguing that the

claim was barred by the discretionary function exception to the

Federal Tort Claims Act's waiver of sovereign immunity.  See 28

U.S.C. §§ 1346, 2680(a).  At an oral hearing on March 24, 2011,

this Court granted that motion to dismiss, ruling that the

maintenance of the guardrails at the Commandant's House was a

discretionary function excepted from the waiver of sovereign immunity. Mahon now moves for reconsideration of that ruling.

## II. FACTUAL ALLEGATIONS

The United States, through the Department of the Interior and the National Park Service (the "Service"), owns, operates, and controls the Commandant's House, which is entirely within the Navy Yard in Charlestown, Massachusetts. Am. Compl. ¶¶ 17-33, ECF No. 12. The Commandant's House and Navy Yard are part of the Boston National Historic Park. Id. ¶ 17. The Service entered into an agreement (the "Agreement") with Eastern National pursuant to which Eastern National provides leasing management for the Commandant's House in order "to provide a service to visitors and income to [the Boston National Historic Park]." ECF No. 22-1. In exchange, the Service receives a portion of the rental fees paid to Eastern National. Id. ¶ 5. Eastern National contracted with Amelia Occasions to handle day-to-day leasing management of the Commandant's House. See ECF No. 22-2.

On October 17, 2008, Mahon was lawfully walking about the portico of the Commandant's House. Am. Compl. ¶ 43. He fell from the portico, sustaining severe and permanent injuries. Id. He alleges that this fall and the resulting injuries were caused by "the dangerous and defective condition of the railing" on the portico. Id. He claims that the United States and the other

defendants were negligent in maintaining the railings and in allowing the portico to be used in such a condition.  Id. ¶ 46.

**III. ANALYSIS**

In his motion for reconsideration, Mahon primarily relies on the Agreement between the Service and Eastern National, which the United States provided to him after he filed his response to the motion to dismiss but before the oral hearing on that motion. Mahon argues that this Agreement was a concession contract and, as a result, the Service was required to take certain non-discretionary actions with respect to risk management. Consequently, he claims, the Service's failure to act falls outside the discretionary function exception to the Federal Tort Claims Act's waiver of sovereign immunity.

**A.    Motion for Reconsideration**

As an initial matter, the United States challenges the propriety of Mahon's motion for reconsideration and the evidence upon which it relies.  The United States argues that the Agreement is not "newly discovered evidence" within the meaning of Federal Rules of Civil Procedure 59 and 60.  See Opp'n Pl.'s Mot. Reconsideration ("Def.'s Opp'n") 6, ECF No. 25.

The parties agree that Mahon received the contract in question from the United States on February 24, 2011.  At that time, Mahon had already filed his opposition to the United States' motion to dismiss.  See ECF No. 15.  The United States

argues, however, that Mahon ought have filed a motion for leave
of the Court to file additional briefing and presented its
arguments based on the newly-received Agreement prior to the
March 24 hearing.

The Court rejects this argument.  Mahon's counsel made
reasonable efforts to procure a copy of the Agreement between the
Service and Eastern National prior to filing his opposition to
the motion to dismiss.  See Zwiebel Aff. ¶ 16, ECF No. 16-1.  The
fact that the United States did not produce the document until
after the opposition was filed ought not be held against Mahon.
Accordingly, the Court accepts Mahon's argument that the
Agreement between the Service and Eastern National is newly
discovered evidence and will consider the substance of Mahon's
arguments based on that document.

**B.   Discretionary Function Exception**

As the Court understands it, Mahon's principal argument in
favor of reconsideration has four elements: (1) the Agreement
between the Service and Eastern National was a concession
contract as that term is used in 16 U.S.C. § 5952 and defined in
36 C.F.R. part 51; (2) the Service has issued Management Policies
which provide specific rules for concession contracts; (3) one
such rule is a requirement that the concessioner develop a risk
management plan and that the park superintendent review and
approve that plan, see National Park Service Management Policies

2006 ("Management Policies") § 10.2.4.8, ECF No. 14-5; (4) the

Service - through the park superintendent - failed to carry out

its non-discretionary duty to review and approve a risk

management plan and that failure caused Mahon's injuries.

The United States raises two primary objections to this

argument.  First, it argues that the Agreement between the

Service and Eastern National was not a concession contract.

Second, it argues that even if the Agreement was a concession

contract, no non-discretionary action of the Service contributed

to Mahon's injuries.  The Court will address each of these

arguments in turn.

### 1.  Legal Standard

"Absent a waiver, sovereign immunity shields the Federal

Government and its agencies from suit."  Federal Deposit Ins.

Corp. v. Meyer, 510 U.S. 471, 475 (1994).  The Federal Tort

Claims Act serves as a limited waiver of sovereign immunity that

allows tort claims against the federal government "under

circumstances where the United States, if a private person, would

be liable to the claimant in accordance with the law of the place

where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

This waiver of sovereign immunity does not, however, apply to

"[a]ny claim . . . based upon the exercise or performance or the

failure to exercise or perform a discretionary function or duty

on the part of a federal agency . . . whether or not the

discretion involved be abused." <u>Id.</u> § 2680(a). An act or omission is considered to be discretionary within this section when it is (1) "a matter of choice," rather than being mandated by federal statute, regulation, or policy; and (2) "based on considerations of public policy." <u>Berkovitz</u> v. <u>United States</u>, 486 U.S. 531, 536-37 (1988). This exception was intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." <u>United States</u> v. <u>S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. 797, 814 (1984).

The discretionary function exception to the waiver of sovereign immunity implicates this Court's subject matter jurisdiction over the claim against the United States. <u>See Irving</u> v. <u>United States</u>, 162 F.3d 154, 160 (1st Cir. 1998). Because Mahon is seeking to invoke the subject matter jurisdiction of this Court, he bears the initial burden of demonstrating its existence. <u>Johansen</u> v. <u>United States</u>, 506 F.3d 65, 68 (1st Cir. 2007). The United States, however, bears the burden of establishing the applicability of the discretionary function exception. <u>See</u> <u>Smith</u> v. <u>United States</u>, 943 F. Supp. 159, 168 (D.R.I. 1996); <u>see also</u> <u>Faber</u> v. <u>United States</u>, 56 F.3d 1122, 1124 (9th Cir. 1995). <u>But see</u> <u>Autery</u> v. <u>United States</u>, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993) (opining but not holding

6

that the plaintiff might bear the burden of proving the
inapplicability of the discretionary function exception).  In
meeting this burden, the United States benefits from a
presumption that any of its discretionary actions implicate
policy judgments.  See Wood v. United States, 290 F.3d 29, 37
(1st Cir. 2002).

### 2.  Concession Contract

Mahon's theory of liability relies on the argument that the
Service had a non-discretionary duty to review and approve a risk
management plan created by Eastern National.  Per the Service's
Management Policies, such a duty exists only if the Agreement
between the Service and Eastern National is a concession
contract.  See Management Policies § 10.2.4.8.  The United States
argues that the Agreement is not a concession contract, so
Mahon's theory of liability must fail.

Concession contracts are authorized by the National Parks
Omnibus Management Act of 1998 (the "Management Act").  Pub. L.
No. 105-391, 112 Stat. 3497, codified at 16 U.S.C. §§ 5901-6011.
"Except as provided by this subchapter or otherwise authorized by
law, the Secretary [of the Department of the Interior] shall
utilize concessions contracts to authorize a person, corporation,
or other entity to provide accommodations, facilities, and
services to visitors to units of the National Park System."  16
U.S.C. § 5952.  Such accommodations, facilities, and services are

limited to those that "are necessary and appropriate for public

use and enjoyment" of the national parks.  Id. § 5951(b)(1).  In

addition to concession contracts, the Management Act authorizes

the Service to grant commercial use authorizations for certain

uses of national parks.  Id. § 5966.  The permissible scope of

such commercial use authorizations is tightly limited, including

a restriction that commercial operations authorized in such a way

cannot exceed $25,000 in annual gross receipts.  Id.

§ 5966(c)(1).  Separate statutory provisions also authorize the

Service to enter into cooperative agreements with educational

institutions, see id. § 1a-2(j), and to lease portions of

national parks, see id. § 1a-2(k).

The Secretary of the Interior has issued regulations further

defining and controlling concession contracts.  See 36 C.F.R.

part 51.

> The purpose of concession contracts is to authorize
> persons (concessioners) to provide visitor services in
> park areas. . . . [T]he Director [of the Service] will
> utilize concession contracts to authorize the provision
> of visitor services in park areas, except as may
> otherwise be authorized by law.  For example, the
> Director may enter into commercial use authorizations
> . . . and may enter into agreements with non-profit
> organizations for the sale of interpretive materials and
> conduct of interpretive programs . . . .

Id. § 51.1.  "A concession contract . . . means a binding written

agreement between the Director and a concessioner . . . that

authorizes the concessioner to provide certain visitor services

within a park area under specified terms and conditions."  Id. §

51.3.  The regulations further provide certain minimum

requirements for a concession contract, including the

consideration to be paid to the government, the visitor services

the concessioner is authorized to provide, and any measures the

concessioner must take to preserve and protect the resources of

the national park.  Id. § 51.5(a).

Here, the United States asserts that the Agreement between

the Service and Eastern National is not a concession contract.

This argument has two principal bases.  First, the United States

argues that the Agreement does not authorize the provision of

"visitor services" as that term is used in the statutes and

regulations concerning concession contracts, and thus, the

Agreement cannot be a concession contract.  Second, the United

States argues that the Agreement did not take the form of a

concession contract.

### a.  Visitor Services

Per the regulations issued by the Secretary of the Interior,

"[v]isitor services means accommodations, facilities and services

determined by the Director as necessary and appropriate for

public use and enjoyment of a park area provided to park area

visitors for a fee or charge by a person other than the

Director."  Id. § 51.3.  "Visitor services may include, but are

not limited to, lodging, campgrounds, food service,

merchandising, tours, recreational activities, guiding,

transportation, and equipment rental." Id.  The United States emphasizes two aspects of this definition: the requirement that visitor services be "necessary and appropriate" and the listed examples.  It argues that the services provided under the Agreement were not necessary to the enjoyment of the Charlestown Navy Yard and that the special events for which Eastern National was authorized to lease the Commandant's House are not analogous to more common types of visitor services.  The Court is not persuaded by either of these arguments.

As an initial matter, the Court notes that the Agreement itself states that the Service "has requested Eastern National to provide leasing management for the Commandant's House . . . to provide a service to visitors and income to" the Service.  ECF No. 22-1 (emphasis added).  The United States argues that despite this language, the Agreement does not authorize "visitor services" because it will only benefit people who go to the park for specific functions rather than all people who go to the park, and thus the services provided by the Agreement are not "necessary and appropriate" to the use and enjoyment of the park. See Def.'s Opp'n 4.  The Court sees no reason to draw such a distinction as matter of law.  Nothing in the relevant statutes or regulations specifies that "visitor services" are only "necessary and appropriate" when they enhance the use and enjoyment of all people who visit the park.

10

The United States further argues that "[s]imply put,
visitors to the Boston National Historic Park do not have to have
a wedding reception in order to enjoy the park itself; campers to
Yosemite, on the other hand, need food, showers, and firewood."
Id. at 5. The Court declines to adopt such a restrictive reading
of "necessary" as that term is used in the definition of "visitor
services." Indeed, the examples provided in that definition
belie such a narrow interpretation. Among other things, those
examples include tours, guiding, and equipment rental. None of
these examples are absolutely essential to persons enjoying
national parks: instead of taking part in a tour, individuals
could explore parks independently; instead of following a guide,
individuals could purchase and use a map; instead of renting a
canoe, individuals could bring their own canoe or simply swim in
a river. None of these examples of services are such that
individuals would be completely incapable of enjoying a national
park without them. Likewise, although individuals could
certainly enjoy the Charlestown Navy Yard without holding a
wedding reception at the Commandant's House, this Court has no
doubt that, for certain individuals, hosting a wedding reception
or other event at the Commandant's House greatly enhances their
enjoyment of the park. Thus, the Court rejects the United
States' argument that the services authorized by the Agreement
are not "necessary and appropriate" visitor services.

11

Moreover, the Court rejects the United States' argument that the leasing management authorized by the Agreement does not provide "visitor services" because it is different from more common visitor services and not similar to the examples listed in the regulation.  See 36 C.F.R. § 51.3.  Certainly, when one thinks of services provided in a national park, one thinks along the lines of those noted by the United States and discussed in prior judicial decisions.  See Def.'s Opp'n 3 (citing, for example, Lewis v. Babbitt, 998 F.2d 880 (10th Cir. 1993) (firewood); Free Enter. Canoe Renters Ass'n v. Watt, 711 F.2d 852 (8th Cir. 1983) (canoe rental)).  The definition of "visitor services," however, explicitly states that its listed examples are meant to be non-exclusive.  36 C.F.R. § 51.3.  Moreover, because the Charlestown Navy Yard and Commandant's House are significantly different from a more "traditional" national park - Yosemite, for example - it is also reasonable that the visitor services at such a park would be significantly different from the canoe rentals and firewood provided at Yosemite.  As such, the Court is not persuaded that the Agreement does not provide "visitor services" as that term is used in the relevant statutes and regulations.

### b.  Contractual Form

Next, the United States argues that the Agreement cannot be a concession contract because it is not in the form of a

concession contract: it is titled "Memorandum of Agreement"
rather than "Concession Contract;" it is only two-and-one-half
pages long; it does not contain "carefully controlled safeguards"
as required by 16 U.S.C. § 5951; and it does not refer to Eastern
National as a "concessioner." See Def.'s Opp'n 5. The United
States submits a sample form concession contract which, in
contrast, is twenty-eight pages long, and a declaration by
Anthony R. Conte, the Regional Solicitor for the Department of
the Interior stating that all concession contracts are
denominated as such. See Decl. Anthony R. Conte ¶ 3, ECF No. 26;
Ex. 1, ECF No. 26-1. Although this evidence submitted by the
United States strongly indicates that the Service did not intend
the Agreement to be a concession contract, the United States does
not put forth any reason why such intent is relevant.

Under the applicable regulations, a concession contract has
five possible minimum requirements, three of which are relevant
here: consideration to the United States, "the minimum visitor
services that the concessioner is to be authorized to provide,"
and "the minimum measures that the concessioner must take to
ensure the protection" of the park. 36 C.F.R. § 51.5(a). Each
of these required elements is present in the Agreement: Eastern
National agreed to remit ten percent of gross rentals to the
Service, Eastern National agreed that it would make the
Commandant's House available for rental 362 days per year, and

Eastern National agreed to comply with two attachments listing
rules for the protection of the Commandant's House and its lawn.
Agreement ¶¶ 3-5.  Thus, the minimum requirements of a concession
contract appear to be met.

Moreover, the Court is troubled that, despite the United
States' forceful argument that the Agreement is not a concession
contract, it never specifies what, alternatively, the Agreement
ought be considered.[1]  The Management Act specifies that the
Service "shall utilize" concession contracts to provide visitor
services "except as . . . otherwise authorized by law."  16
U.S.C. § 5952.  In addition to concession contracts, the Service
is authorized to provide services by way of commercial use
authorizations, id. § 5966(c)(1), cooperative agreements, id. §
1a-2(j), and leases, id. § 1a-2(k).  The Agreement cannot be a
commercial use authorization since its gross annual receipts
certainly exceed $25,000, see id. § 5966(c)(1); it cannot be a
cooperative agreement since it is not educational in nature, see

---

[1] The United States does briefly argue that the wedding
reception ought be considered a "special park use" under the
Management Policies.  See Def.'s Opp'n 5.  The Management
Policies dealing with special park uses, however, clearly
contemplate such uses being authorized by permits issued directly
by the Service to individuals.  See Management Policies
§ 8.6.1.1.  Here, the Service contracted with Eastern National to
manage rentals of the Commandant's House, distinguishing this
situation from a special park use.  Because of the participation
of third-party commercial entities in the management of the
Commandant's House, the Court considers the present arrangement
much more like a concession than a special park use.

id. § 1a-2(j), and it is not, on its face, a lease.  Thus, absent

some other justification for the Agreement by the United States,

the Court is left to decide whether the Agreement is a concession

contract or an ultra vires act on the part of the Service.

Despite its claimed formal shortcomings - none of which raise any

conflict with the requirements of the Management Act - the

Agreement satisfies the minimum requirements of a concession

contract, so the Court cannot hold as matter of law that it ought

not be considered one.

For the foregoing reasons, this Court rules that, at this

stage in the litigation, at which the United States bears the

burden of showing that the discretionary function exception to

the waiver of sovereign immunity is applicable, the United States

has not carried that burden.  Based on the record currently

before the Court, the United States has not demonstrated that the

Agreement is not a concession contract.  Thus, Mahon's theory of

liability based on the Service's duty to carry out certain non-

discretionary actions with respect to concession contracts

remains viable.

### 3.  Non-Discretionary Function and Causation

The second main argument of the United States against

Mahon's theory of liability is that, even if the Agreement is a

concession contract, the Service's Management Policies require

that the concessioner, not the Service, develop a risk management

plan.  See Management Policies § 10.2.4.8.  Although this is

true, the same section of the Management Policies requires that

the risk management plan developed by the concessioner be

approved by the park superintendent and that "[t]o ensure

compliance, the Service will include a risk management evaluation

as part of its standard operational review of concession

operations."  Id.  Thus, although the Management Policies impose

a duty upon the concessioner, they impose a parallel duty upon

the Service, the breach of which can serve as the basis for a

suit under the Federal Tort Claims Act.

To be clear, the Court is not ruling that decisions to alter

the guardrails at the Commandant's House were not within the

discretion of the Service.  Congress placed such decisions, which

implicate important policy concerns regarding historical

preservation, within the discretion of the Service.  See Shansky

v. United States, 164 F.3d 688, 693 (1st Cir. 1999).

Nonetheless, Mahon has sufficiently alleged that the Service had

a non-discretionary duty to review and approve a risk management

plan developed by its concessioner.  If the Service, in

conducting such a review, found shortcomings in the risk

management plan, it might have been required to take any of a

number of possible steps to remedy the flaws short of actually

altering the guardrails.  Mahon, however, alleges that no such

review ever took place.

16

At this stage in this litigation, the Court expresses no position on whether the Service actually failed to carry out a non-discretionary duty or whether any such failure caused Mahon's injuries.  The facts alleged in Mahon's complaint, however, state a plausible claim for liability on the part of the United States.  For that reason, the United States' motion to dismiss ought have been denied.

## IV.  CONCLUSION

For the foregoing reasons, Mahon's motion for reconsideration, ECF No. 21, is allowed.  This Court's ruling of March 24, 2011, dismissing Mahon's claims against the United States is vacated, and the United States' motion to dismiss, ECF No. 13, is, instead, denied.

SO ORDERED.


 /s/ William G. Young
William G. Young
District Judge